# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 1:15CR362 (CMH) |
| | : | |
| v. | : | |
| | : | |
| ALBERT K. CAMBATA | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**
**IN SUPPORT OF A SENTENCE OF PROBATION**

I.   **PRELIMINARY STATEMENT**

Albert Cambata comes before the court[1] for sentencing having pled guilty to one count of filing a false income tax return. The tax loss is $84,849. As of the day of sentencing he will have complied with all aspects of his plea agreement including the payment of restitution beyond that required by his plea agreement. Mr. Cambata has resided in Switzerland for many years and is not a U.S. citizen. Unlike others charged with tax offenses who reside in countries without extradition treaties with the U.S., Mr. Cambata has freely appeared before this court to face these charges. Mr. Cambata has exhibited extraordinary cooperation and acceptance of responsibility. This is his first offense. He has been married for almost thirty years, has three daughters and is a responsible member of his community. Other defendants guilty of similar offenses have received probationary sentences. A sentence of probation will satisfy all the objectives of sentencing.

II.   **ALBERT CAMBATA'S PERSONAL HISTORY**

In Mr. Cambata's letter to the Court he describes the very dysfunctional relationship he had with his family in contrast to the very "close relationship he has to his wife and three daughters"; his up-bringing as a child and young man living throughout the world; his father's decision to place the family business in the hands of a younger brother; the significant family strife that ensued; and Albert's and his wife's decision to move the family to Switzerland in 2007.

---

[1] Mr. Cambata's medical doctors have advised against long distance travel due to his spinal conditions. Exhibit A. Mr. Cambata is on the wait list for spinal surgery in May or June in Switzerland. Despite this recommendation Mr. Cambata has not sought a continuance of his sentencing and has made the long distance trip from Switzerland.

In Switzerland, the Cambatas established a new life.  They had cut their ties with Albert's family and the United States.  By the time 2012 arrived, the Cambatas had been living in Switzerland for over five years.  Despite his life in the U.S., he had no plans for returning and circumstances strongly suggested that he renounce his U.S. citizenship.  Accordingly, Albert surrendered his U.S. passport in September of 2012.

After receipt of very large financial gift from his father in 2006, a bank account at UBS in Switzerland was opened and the gift was deposited into that account.  In 2008, Albert moved the majority of the funds held at UBS to accounts in Singapore and Monaco. This achieved two goals: (1) savings under the Swiss taxation system to which Mr. Cambata as a Swiss resident was subjected and (2) diversification of assets in a highly volatile global banking environment.

Mr. Cambata admits to errors in his tax filings beyond those to which he has pled guilty.  He did not report the existence of his foreign accounts on his U.S. tax returns.  He understands he is ultimately responsible for the accuracy of his own return.  However, Albert retained a Virginia-based accounting firm to prepare his U.S. tax returns even after he moved to Switzerland.  The accounting firm was aware that he was living in Switzerland, that he was subject to Swiss social security tax, that he communicated with the accounting firm from Switzerland and that he had a bank account in Switzerland.  Nonetheless when the accounting firm prepared the U.S. tax returns, Albert did not notice that they had improperly answered "No" to the question on the returns concerning the existence of a "foreign bank account"

Further, Mr. Cambata failed to file U.S. tax returns for the year 2011 and for a portion of the year 2012.  In 2012 his mindset was that he was cutting his ties with the U.S.  Regretfully he did not seek professional advice with respect to the proper way to expatriate.  Albert is now in

the process of correcting this error by filing U.S. income tax returns for 2011 and 2012 and also filing the appropriate forms for tax expatriation.

Albert's biggest failure is not living up to his own standards and he relates that telling his wife and daughters about his transgressions was one of the most difficult things that he has ever done in his life. He fully admits his guilt. He states in his letter to the court:

> Your Honor, I am guilty of not reporting the interest income earned on my accounts in 2007 and 2008. Obviously, and I knew it, accounts with a few millions of dollars in them had to generate at least some income in those days, and I knew that and I failed to look and properly report that income. I intentionally ignored the accounts and did not bother to check how much they had earned. This was wrong.

Exhibit B.

### III. SUPPORT FROM FAMILY AND FRIENDS

Albert's longtime friends, Mr. & Mrs. E C J Lilley have written a letter of support to the Court. The Lilleys and the Cambatas have been close friends for over 30 years. The Lilleys are aware of Mr. Cambata's offense and were surprised to hear of his conduct.

> "He is certainly ashamed and very self-conscious about what has happened and has admitted that what he did was wrong. …. [he] is devastated that he has fallen short of the high standards he sets for himself. He is a well-regarded member of the neighborhood in Lugano where they live and is embarrassed about the negative impact this might have on his standing in the local community."

Exhibit C, page 1.

Altaire Cambata, the Cambata's eldest daughter has written to the Court. Exhibit C, pages 2-3. She relates that "we were all shocked to hear of the tax offence and every member of our family is disappointed by the events that led to the current situation, especially my father, who has on multiple occasions expressed remorse for failing to pay his full U.S. taxes….and the

4

repercussions the decision has afflicted on all our lives knowing that what had transpired was wrong.

Victoria Cambata, the Cambatas' middle daughter, writes to the Court that she:

> …was surprised to hear of his tax offense. He has always emphasized being alert, diligent and on top of what is required of us by our parents, our school or the government.
>
> My dad has spoken to all of us about why any and all actions leading to this offense were wrong, and how negatively it can affect you and your loved one's lives when you commit an offense like this. My father has expressed his regrets on a few occasions from both a logical and emotional perspective, and we all shared in this as a family.

Exhibit C, pages 4-5.

Alaya Cambata, the Cambatas' youngest daughter, has written to the Court. Alaya was shocked and surprised to hear of her father's offense.

> "It shocked me to hear of his tax offence suit because I grew up with a father who was always very concerned with everything being in its right place. I believe that is why he hasn't rested until he could settle this case,… . We could all feel his regret for not completing his 2007-2008 tax forms because we know he always felt a moral obligation to teach us the importance of doing what we can to right our wrongs.

Exhibit C, page 6

Finally, Celia Cambata has also written to the Court. The Cambatas will be married 30 years this coming June. She describes the impact the prosecution has had on Albert:

> "Having watched his reactions to these financial charges over the past 2 years or so, I have seen Albert upset and disappointed in himself. I know from watching him and listening to him that he feels bad and guilty and that he broke confidence with his own strong values. The reason that he has pled guilty is that he acknowledges the withholding of interest earned was intentionally done. He is certainly remorseful and has taken full responsibility and has told me and the girls of his disappointment in himself over the whole business."

5

Exhibit C, page 7.

**IV.     THE SECTION 3553(a) FACTORS SUPPORT A SENTENCE OF PROBATION**

It is up to this court to select an appropriate sentence in accordance with the factors in 18 U.S.C. §3553(a). One of those factors is the type and range of sentence established by the guidelines. 18 U.S.C. §3553(a)(4). However, the guidelines are merely advisory. *United States v. Booker*, 543 U.S. 220, 245 (2005). While the section 3553(a) analysis still begins with a consideration of the guidelines, it does not end there. *Rita v. United States*, 551 U.S. 338, 351 (2007). The sentencing judge does not perfunctorily impose a guideline sentence or even presume that such a sentence is appropriate in a given case. *Gall v. United States*, 552 U.S. 38, 50 (2007). The guidelines range is only "a rough approximation of sentences that might achieve §3553(a)'s objectives in the "mine of the run of cases". *Rita*, 551 U.S. at 350-51. It supplies "the starting point and the initial benchmark" but nothing more. *Gall*, 552 U.S. at 49.

After consideration of the guideline range, the court then must consider the other section 3553(a) factors. *Gall*, 552 U.S. at 49-50. Ultimately it falls on the court to weigh and balance the various factors and to "make an individualized assessment based on the facts presented". *Gall*, 552 U.S. at 50 (viewing "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"). The open-endedness of this Section 3553(a) factors leaves ample room for the court's discretion and thus we consider those factors.

*The Nature and Circumstances of the Offense and The History and Characteristics of the Defendant*

This is Albert Cambata's first offense. It is a serious but a non-violent offense. He is otherwise a model citizen, a loving husband and a doting father to three daughters.

Long before the government's investigation Albert moved to Switzerland because of family disputes. He established various bank accounts in Switzerland and elsewhere. Albert intentionally did not report the interest income earned on certain bank accounts on his 2008 federal income tax returns. The total tax loss arising from his conduct (involving his 2007 and 2008 income tax returns) is $84,849. Albert has pled guilty to filing a false return and accepts full responsibility for his failures. Amended returns have been prepared for 2007 and 2008. They report a total civil liability of $177,147 (inclusive of the $84,849, the criminal tax loss and the agreed to restitution). Albert is prepared to pay that total liability promptly. (Albert offered through counsel to file the amended returns along with full payment a week before sentencing but was instructed by the government to defer doing so until after sentencing.)

Albert's cooperation with the government and his acceptance of responsibility is extraordinary. As of September 2012 he was no longer a U.S. citizen. His expatriation was not prompted by the government's investigation. This was the culmination of planning that had commenced in 2007. In October 2014 the DoJ sent Albert a target letter. He responded promptly and responsibly. He decided to "face the music". Unlike other persons living in countries that do not have extradition treaties with the U.S. for tax offenses, Albert did not hide behind the protection of Swiss law. Albert could have forced the United States to indict him and then frustrate the government's efforts by simply staying in Switzerland free from extradition and never facing these charges. By not forcing the return of an indictment and by voluntarily

coming to the United States, Albert Cambata has expressed an extraordinary level of cooperation and acceptance of responsibility.

Mr. Cambata has set the gold standard for individuals who are charged with (or being investigated for) criminal conduct but who are beyond the reach of the U.S. government. Albert has met the charges and fully cooperated with the DoJ. Before he entered his plea of guilty he voluntarily traveled to the U. S. with no guarantee that he would be permitted to return to Switzerland. He has prepared for immediate filing amended tax returns and is ready to immediately pay restitution beyond that required by his plea agreement. Mr. Cambata admits he did not seek advice regarding the proper process for expatriation but he now is in the process of preparing the required returns and the necessary forms to effect his expatriation for tax purposes.

Albert has been charged and has pled guilty to filing a false tax return for 2008[2]. He has also admitted that his 2007 tax return was not accurate. He has not been charged with any other offense. The pre-sentence report includes matters from the government's investigative file regarding alleged unreported income and unfiled returns and forms. Mr. Cambata has commented on these facts and those comments are contained in the final pre-sentence report. However, it is appropriate to briefly comment on these matters in the context of this §3553(a) factor.

---

[2] Although the offense to which Mr. Cambata has pled is not a crime under Swiss law, it may have an impact on his eligibility for Swiss citizenship since a candidate for Swiss citizenship must produce his criminal and judicial records which will include his conviction in the United States. Exhibit D.

Albert admits that his income tax filing history has not been without blemish[3]. As noted, he relinquished his U.S. passport in 2012. By that time he and his family had spent more than five years living in Switzerland. The Cambatas had purchased a home in Switzerland, their daughters were going to school there and they had established themselves as members of their new community. At the same time Albert had cut all ties to his former home in the U.S. and was estranged from his family members who all lived in the U.S. By 2012 he was of a mindset that he had no further U.S. connections or obligations. *He was wrong*. He did have an obligation to file tax returns for 2011 and for a portion of 2012. He also had the obligation to file certain "exit tax" forms incident to his expatriation. He is presently in the process of correcting these errors and expects to file these delinquent tax returns and forms within the next several months.

### *The Need for the Sentence Imposed*

Mr. Cambata understands the seriousness of the offense as expressed in his letter to the court. Protection of the public, specific deterrence and remedial education are not issues here. 18 U.S.C. 3553(a)(2) (B),(C),(D).

Sentencing Mr. Cambata to a period of incarceration is not necessary for general deterrence. The government's recent crackdown on undisclosed foreign bank accounts has gone far to deter the public from engaging in such conduct and, although the government repeatedly argues that all defendants convicted of tax crimes should serve a sentence of incarceration to

---

[3] Despite the errors in his returns Albert paid a considerable amount in taxes. Between 2007 and 2010 Albert filed federal income tax returns. During this period he paid $374,829 in U.S. income taxes (before the amendments to his 2007 and 2008 returns which reflect an additional tax due of $177,137). Starting in 2008 Albert filed Swiss tax returns paying $530,016 in tax between 2008 and 2012 . (The Swiss tax is primarily based on a computation of living expenses including a multiple of the rental value of a person's home). Accordingly, between the two jurisdictions Albert paid a total of $904,846 in taxes as reported on originally filed returns (and $1,081,982 in total when the amended returns are considered).

achieve general deterrence, such a position has been rejected as in conflict with the dictates of the sentencing statute and the requirement that District Courts evaluate *all* of the sentencing factors in fashioning a sentence that fits the defendant. *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (rejecting the government's contention that upholding the probationary sentence imposed in the defendant's criminal tax case would lessen the deterrent value of the criminal law "because it elevates one Section 3553(a) factor – deterrence – above all others. As §3553(a) makes clear, the District Court at sentencing must consider and balance a number of factors – not all of which will point in the same direction"). *See also United States v. Tomko*, 562 F.3d 558, 563 (3rd Cir. 2008) (rejecting the government's argument that "failure to incarcerate [the defendant]…would compromise the general deterrent effect the tax laws have on potential tax cheats").

### *The Sentencing Guidelines and The Kinds of Sentences Available*

The presentence report properly computes the Sentencing Guidelines range applicable here. However, the court has authority and may exercise its discretion to consider a wide range of alternatives to imprisonment.

Here, it is respectfully submitted that a sentence within the guideline range (12 to 18 months) is not appropriate given that Mr. Cambata's extraordinary cooperation and acceptance of responsibility are mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that would result in a sentence different than that described. §3553(b)(1).

### *Penitent Policy Statements*

There are no pertinent U.S. Sentencing Commission policy statements.

*The Need to Avoid Unwarranted Sentencing Disparities*

There is a need to avoid unwarranted sentence disparities among defendants with similar records who are guilty of similar conduct. This factor weighs very heavily in this matter. There have been numerous sentencing resulting from the IRS and DoJ efforts over the past several years to pursue U.S. taxpayers with unreported offshore income. Admittedly, no cases are exactly alike. Some cases involve government-sponsored section 5K-1.1 departures which is not present here. Some cases involve extraordinarily high tax losses (not present here) resulting in sentences which did not include a period of incarceration. For instance:

- Ty Warner – tax loss in excess of $5 million, sentenced to a term of supervised release, community service but no prison time. *U.S. v. Warner*, 13-CI-731 (N.D. Ill.)

- Igor Olenicoff – tax loss of more than $52 million (inclusive of interest and penalties) – received a two-year probationary term. *U.S. v. Olenicoff,* No. 07-CR-227 (C.D. Cal.).

Cases more similar to Mr. Cambata's, at least with respect to the Guidelines Offense Level, Tax Loss and the absence of 5K-1.1 departure are as follows:

| Case | Offense Level | Tax Loss | Sentence |
|---|---|---|---|
| Eisenberg 2:CR 00369-JCC (W.D. Wash.) | 13 | Not specified | 3 years' probation |
| Hoess (D. N.H.) | 19 | Not specified | 3 years' probation |
| Gabell: 14 CR 207-JBW (E.D. N.Y.) | 17 | $239,000 | 3 years' probation |
| Roessel: 12-CR 60074-KMW (S.D. Fla.) | 17 | $312,802 | 3 years' probation |
| Curran: 9:12-CR 80206 (S.D. N.Y.) | 19 | $400,000 to $1 million | 1 year probation |
| Ahuja: 211-CR 00135 (E.D. Wis.) | 22 | $967,000 | 3 years' probation |
| Zaltsberg: 2:10-CR-00437-SRC (D.N.J.) | 13 | $64,000 | 4 years' probation |

11

Accordingly, taxpayers similarly situated to Mr. Cambata, at least with respect to offense level, tax loss and the absence of 5K-1.1 motion, have received probationary sentences and no prison terms.

Of additional note are two cases from this district.  Josef Dorig and Andreas Bachmann were indicted along with four other individuals in February of 2011.  *United States v. Adami* et al, No 1:11-cr-95-GBL, E.D. VA.  According to the superseding indictment, an international bank's managers and bankers engaged in illegal cross-border banking that was designed to assist U.S. customers evade their income taxes.  Mr. Bachmann was a private banker who traveled to the U.S. to assist U.S. taxpayers in evading their U.S. taxes.  Mr. Dorig was the founder of a Swiss trust company which was a preferred provider of the international bank who also assisted U.S. customers in evading their U.S. taxes.

It was not until three years after the indictment, in the spring of 2014, that Mr. Dorig and Mr. Bachmann, who both resided in Switzerland, ultimately decided to "face the music".  The stipulated tax loss for their conduct was more than $7 million and less than $20 million.  Mr. Dorig's *offense level was 27* with an advisory range of *70 to 87 months* in prison.  Mr. Bachmann's *offense level was 22* with an advisory range of *46 to 57 months* in prison.  The government made a sentencing recommendation of five years of unsupervised probation and a fine of $125,000 along with a $100 special assessment.  That recommendation was accepted by the court.

Admittedly, the government filed a 5K-1.1 motion for departure in those two matters.  That factor is not present in this case:  But the absence of a 5K-1.1 motion does not deter from the court's ability to consider a defendant's cooperation in fashioning the appropriate sentence.

*United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014). Mr. Cambata simply did not conspire with other individuals to violate U.S. law as was apparently the case with Mr. Dorig and Mr. Bachmann. He simply had no information with respect to the criminal activities of persons other than himself. Notwithstanding the absence of a 5K-1.1 departure recommendation, Mr. Cambata distinguishes himself from Messrs. Dorig and Bachmann by promptly cooperating with the government, not hiding out in Switzerland for years, not putting the government to the task of returning an indictment and making extraordinary restitution from his own funds (the restitution with respect to Dorig and Bachmann was apparently made by their employer).

Even if there were not numerous other factors warranting a non-custodial sentence in this case, sentencing Mr. Cambata to prison would create a disparity in sentencing treatment of other similarly situated defendants.

### *The Need to Provide Restitution*

As noted above, Mr. Cambata, absent the government's directive, would have already paid the restitution required by his plea agreement. In addition, he would have already paid not just the restitution amount (which is the criminal tax loss) but the entire civil tax liability arising out of his 2007 and 2008 amended tax returns. Accordingly, the need for restitution has been met; in fact full restitution beyond that required has been made.

### V. CONCLUSION

Based on the foregoing it is recommended that the court impose the following sentence: unsupervised probation for a period of three years with the following special conditions: (a) that within four months of the date of sentencing Mr. Cambata file U.S. income tax returns for the years 2011 and 2012 and file the required forms to complete his expatriation and (b) that Mr.

Cambata pay: (1) the tax due for the years 2011 and 2012 and (2) any tax due as a result of his expatriation both within the time agreed to by the defendant and the Internal Revenue Service; a fine of $30,000 and restitution in the amount of $84,849, both to be paid immediately.

Respectfully submitted,

**DUANE MORRIS LLP**

Dated:  April 22, 2016       By: /s/ Joseph J. Aronica
　　　　　　　　　　　　　　　　Joseph J. Aronica, VA Bar No. 02548
　　　　　　　　　　　　　　　　DUANE MORRIS LLP
　　　　　　　　　　　　　　　　505 9th Street, N.W., Suite 1000
　　　　　　　　　　　　　　　　Washington, DC  20004
　　　　　　　　　　　　　　　　Tel:  (202) 776-7824
　　　　　　　　　　　　　　　　Fax:  (202) 478-1885
　　　　　　　　　　　　　　　　Email:  JJAronica@duanemorris.com

　　　　　　　　　　　　　　　　*Counsel for Defendant Albert K. Cambata*